# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# EASTERN DIVISION

| | | |
|---|---|---|
| **MATTHEW C. GRANTHAM,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 1:09-CV-1992-VEH** |
| | ) | |
| **AGRIUM ADVANCED** | ) | |
| **TECHNOLOGIES (U.S.) INC., f/k/a** | ) | |
| **AGRIUM POLYMER COATINGS** | ) | |
| **CORP.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

## I.     INTRODUCTION

This matter is presently before the court on "Plaintiff's Motion to Facilitate Court-Approved Notice Under 29 U.S.C. § 216(b)" (doc. 18) filed by Plaintiff Matthew C. Grantham.  Grantham seeks leave to send notice of this lawsuit to "all current and former hourly wage employees of the Defendant [Agrium Advanced Technologies (U.S.) Inc. f/k/a Agrium Polymer Coatings Corp. ("Agrium")] who have been employed by [Agrium] within the three years pre-dating their opting into this case, i.e., since approximately [March 1, 2007]."[1]  (Doc. 18, p. 1).  Grantham limits

---

[1] Grantham has filed three briefs (an initial brief, a reply, and a "Sur-Sur Reply") in support of his motion.  Throughout those briefs, Grantham contends that various modifications should be made to the potential notice group but, in his Sur-Sur Reply (doc. 31), he recants those proposed changes.  Grantham's representations regarding the notice group has bred confusion in

the putative collective action to those current or former employees at Agrium's facility located in Sylacauga, Alabama.  Agrium filed a brief in opposition to the motion (doc. 22) and objections to the Grantham's proposed notice and opt-in form (doc. 24).  Grantham filed a reply brief (doc. 27), to which Agrium filed a sur-reply (doc. 29).  Grantham filed a "Sur-Sur Reply" (doc. 31).  This matter has been fully briefed and is ripe for review.  After giving careful consideration to the Motion for Conditional Certification, the related briefs and evidence,[2] and for the reasons set forth herein, Grantham's Motion for Conditional Certification is due to be **DENIED**.

## II.    FACTUAL BACKGROUND

This action was initiated on October 6, 2009, and is brought under § 216(b) of the Fair Labor Standards Act ("FLSA") by Grantham against Agrium.  (Complaint, doc. 1).  In his Complaint, Grantham alleges that he and roughly 70 other current and former hourly employees of Agrium have been or are presently being compensated in a manner that violates the FLSA.  Specifically, Grantham alleges that he was not paid for time he was required to perform pre-shift work.  (Complaint, doc. 1, p. 4-6).

---

this case, and the resulting effects of Grantham's conflicting contentions regarding the proposed notice group are more fully discussed below.

[2] A period of discovery was permitted between December 2, 2009, and January 15, 2010 (the date Grantham's Motion for Conditional Certification was due).  (Initial Scheduling Order, doc. 12).  The court adopted the proposed deadlines contained in the Report of Parties' Planning Meeting (doc. 11).

The Complaint contains three counts: Count One is for FLSA rounding violations pursuant to 29 C.F.R. § 785.48(b); Count Two is for FLSA "off the clock" violations; and Count Three is for collective action treatment.

### A.    Agrium's facility located in Sylacauga, Alabama

According to Agrium, its facility in Sylacauga, Alabama produces "various types of fertilizer." (Doc. 22, p. 4 (quoting Declaration of Jeff Ogle, doc. 23-1, para. 3)). The facility

> consists of several different areas (contained within multiple buildings over a three or four block radius): the NPK plant, the XCU plant, the Pilot plant, the Precise plant, the Polyon plant (each plant makes different products), several warehouses, several load out areas, maintenance, the QA laboratory, Product Innovation, and Straight Line Bagging.

(*Id.*). "The plants are typically staffed on each shift with one lead operator and one assistant operator," both of whom are hourly employees. (Doc. 22, p. 3). As of March 15, 2010, Agrium employed 62 hourly workers at the Sylacauga facility. (Declaration of Jeff Ogle, doc. 23-1, para. 5). In light of Grantham's contention that the potential class is comprised of approximately 70 people and of the fact that in March of 2010 there were 62 hourly employees employed at the Sylagauga, Alabama, facility, a reasonable inference can be drawn that there are approximately 8 former employees who would be potential opt-in plaintiffs.

B.      Matthew C. Grantham

Grantham, the only named plaintiff in this lawsuit, worked at Agrium from sometime in 1994 until September 18, 2009.  (Declaration of Matthew Grantham, doc. 20-1, para. 1).  He was a former employee of Agrium at the time he commenced this lawsuit.  He "was employed as a Lead Operator." (*Id.* at para. 2).  Grantham's job duties were largely supervisory in nature and "included overseeing [the] plant, overseeing production of the plant, overseeing those who worked under [him], [and] to see that job duties were carried out."  (*Id.* at para. 5).  He was also responsible for addressing computer problems and for reporting any "large breakdown on the shift." (*Id.*).  His last rate of pay was $19.10 per hour.  (*Id.* at para. 3).

According to Grantham, his supervisor, Jeff Ogle, "encouraged" Grantham to arrive at work early "to provide a seamless transition" between Grantham and the lead operator who Grantham was relieving from duty.  (*Id*. at para. 7).  Grantham would "typically arrive at work approximately 15 minutes before the beginning of [his] shift in order to talk with the person [he] was replacing to determine the current status of all on-going work for which [he] was responsible . . . ."  (*Id.* at para. 9).  He also claims that he would "often take over responsibility" for the lead operator's duties before his scheduled shift.  (*Id.* at para. 10).  Grantham states that he "typically worked 1 hour per week pre-shift for which [he] was not paid 1.5 times [his] hourly

rate during overtime weeks." (*Id.* at para. 11).

### C.    The Potential Opt-In Plaintiffs

#### 1.    Jeff McDonald

Jeff McDonald is a former employee of Agrium who filed a "Consent to Become a Party Plaintiff" to this action on October 29, 2009. (Doc. 10-1). McDonald worked at Agrium from roughly 2005 until 2008. (Declaration of Jeff McDonald, doc. 20-3, para. 1). He was employed as a "Loader Operator," and his last rate of pay was $11.35 per hour. (*Id.* at para. 2-3). McDonald's job duties included "keeping bins loaded that fed the drums and mixers; helping and assisting [the] operators as requested." (*Id*. at para. 5).

McDonald states that his supervisors, Jeff Ogle and Mark Brooks, "encouraged" him to arrive at work prior to his scheduled shift "in order to provide a seamless transition of job responsibilities." (*Id.* at para. 7). McDonald contends that he performed pre-shift work during this time for which he was not compensated. (*Id.* at para. 7, 10). He states that he "would typically arrive at work approximately 30 minutes before the beginning of [his] shift in order to talk with the person [he] was replacing to determine the current status of all on-going work for which [he] was responsible on [his] shift." (*Id.* at para. 9). He "typically worked 2 hours per week pre-shift for which [he] was not paid 1.5 times [his] hourly rate during overtime

weeks." (*Id.* para. 11).

### 2.    Anthony Reeves

Anthony Reeves is a former employee of Agrium who filed a "Consent to Become a Party Plaintiff" to this action on October 29, 2009. (Doc. 10-1). He worked at Agrium from June of 2003 until July 16, 2008. (Declaration of Anthony Reeves, doc. 20-2, para. 1). He held the position of "Assistant Operator," and his last rate of pay was $16.73 per hour. (*Id.* at para. 2, 3). His job duties "included doing small maintenance, bag fertilizer in bulk, assist[] the operators, [and] basically made sure the plant operated efficiently." (*Id.* at para. 5).

Like Grantham and McDonald, Reeves states that he was "encouraged to arrive at work early by [his] supervisor, Gary Floyd, in order to provide a seamless transition of job responsibilities." (*Id.* at para. 7). Identical to Grantham and McDonald, Reeves contends that he performed pre-shift work for which he was not compensated. (*Id.* at para. 7, 10). Also, identical to the assertions of McDonald, Reeves states that he "would typically arrive at work approximately 30 minutes before the beginning of [his] shift in order to talk with the person [he] was replacing to determine the current status of all on-going work for which [he] was responsible on [his] shift." (*Id.* at para. 9). He "typically worked 1.25 hours per week pre-shift for which [he] was not paid 1.5 times [his] hourly rate during overtime weeks." (*Id.*

para. 11).

### D.   Agrium's response to Grantham's allegations and declarations

### 1.   Agrium's concessions of fact

Agrium has conceded that, for purposes of the present motion, the following

facts are undisputed:

1.   Each Plaintiff, whether named or opting in, worked for Defendant as a hourly paid, non-exempt employee during at least one overtime week during the last three years. (PX1-3, ¶ 4).

* * *

3.   While Plaintiffs had different job duties, their claims regarding pre-shift . . . "off the clock" work are virtually identical. (PX1-3, ¶¶ 5, 9, 11-13.)

4.   Each Plaintiff was encouraged to arrive at work early by their supervisor.  (PX1-3, ¶ 7).

5.   None of the Plaintiffs were paid overtime for this "off the clock" work performed in weeks in which they had forty hours or more. (PX1-3,¶ 7).

6.   None of the Plaintiffs were paid overtime for this "off the clock" work performed in weeks in which they had forty hours or more. (PX1-3, ¶¶ 11-12).

7.   There are approximately 70 non-exempt, hourly paid employees at this facility during the preceding three years.  (PX4, Response to Request for Admission 8).

8.   "However, for non-exempt hourly employees who do not work in shipping and receiving, neither the punch in time nor the total

number of hours stamped on the employees' paper time cards are used for calculating their hours of work for purposes of determining compensation.  Generally, non-exempt employees (other than those in shipping and receiving)[3] are paid from their scheduled shift start times until they punch out.["]  (PX4, Answer to Interrogatory 1).

9.      "The start time of their pay time coincides with their scheduled shift start, unless the employees are asked to start working before the start of their shift, in which case they are paid from their adjusted scheduled shift start.  For example, an employee who is scheduled to work the 6:00 a.m. to 6:00 p.m. shift and punches in at 5:50 a.m. and punches out at 6:12 p.m., will be paid from 6:00 a.m. until 6:15 p.m." *Id*.  (PX4).

(Grantham's Brief, doc. 19, pp. 2-3; Agrium's Response Brief, doc. 22, p. 4 ("For purposes of this motion only, Defendant accepts Plaintiff's statement of facts paragraphs 1 and 3 through 9 as true.")).[4]

## 2.      Agrium's evidence

As rebuttal evidence to the Declarations of Grantham, McDonald, and Reeves, Agrium submitted declarations[5] from 16 current hourly employees and 6 current

---

[3] The "shipping and receiving" hourly employees are discussed more fully below.

[4] Agrium's arguments and evidence are inconsistent with many of its concessions.  For example, Agrium concedes that Grantham "was encouraged to arrive at work early by [his] supervisor."  Contrary to that concession, Agrium submitted the Declaration of Jeff Ogle, Grantham's supervisor, in part for the proposition that Grantham was not encouraged to arrive early for work.  (Declaration of Jeff Ogle, doc. 23-1, Ex. 17, para. 15).  Where Agrium's arguments and evidence deviate from its concessions, the court has resolved the present motion by deferring to the concessions.

[5] Grantham's counsel raises several concerns he has regarding the declarations provided by Agrium; however, no motion to strike was filed.

supervisors.  Agrium considers it important that its declarations were made by current employees while Grantham's declarations came exclusively from former employees, but it does not develop any argument beyond that general point.  Each of the 16 current hourly employees who provided declarations expressly state that, after conferring with Agrium's lawyer, they do not wish to opt-in this litigation.  According to the declarations, the 16 hourly employees claim they have been fully compensated for all work performed by them.  They each testified that they arrive at work early for different reasons (*i.e.*, socializing with coworkers, etc.), but not to start work before their scheduled shift.

The court notes that the 16 declarations are silent as to whether the current employees were encouraged by their managers to come to work prior to their scheduled shifts.  Grantham's supervisor, Jeff Ogle, stated as follows: "I do not encourage employees to arrive early for work." (Declaration of Jeff Ogle, doc. 23-1, Ex. 17, para. 15).  That statement, however, is contradicted by Grantham's allegations and his declaration as well as Agrium's concession that Ogle did, in fact, encourage Grantham to come to work before the start of his scheduled shift.  Agrium has also conceded that potential opt-in plaintiffs McDonald and Reeves were "encouraged" by their supervisors to arrive at work before their shifts began.

## III.   DISCUSSION

### A.   Grantham's Motion for Conditional Certification

#### 1.   Legal framework for collective action certification

Section 216(b) of the FLSA provides that:

> [a]n action . . . may be maintained against any employer . . . in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated.  No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.

29 U.S.C. § 216(b).

This court uses the "two-step" approach to § 216(b) certification that has been endorsed by the Eleventh Circuit Court of Appeals.[6]   First, the court determines

---

[6] The Court of Appeals for the Eleventh Circuit prefers that district courts employ a two-step approach when determining whether to certify a collective action under Section 216(b).

> The first determination is made at the so-called "notice stage." At the notice stage, the district court makes a decision – usually based only on the pleadings and affidavits which have been submitted – whether notice of the action should be given to potential class members. Because the court has minimal evidence, this determination is made using a fairly lenient standard, and typically results in "conditional certification" of a representative class. If the district court "conditionally certifies" the class, putative class members are given notice and the opportunity to "opt-in." The action proceeds as a representative action throughout discovery.

*Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1218 (11th Cir. 2001) (quoting *Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1213-24 (5th Cir. 1995)).  Although *Hipp* involved a collective action brought under the Age Discrimination in Employment Act of 1967, the Eleventh Circuit has made clear that the analysis set forth in that case applies with equal force to FLSA collective actions. *See Cameron-Grant v. Maxim Healthcare Services, Inc.*, 347 F.3d

whether a collective action should be certified for notice purposes.  A district court, in its discretion, may authorize the sending of notice to potential class members in a collective action in appropriate cases.  *See*, *e.g.*, *Hoffman-La Roche, Inc. v. Sperling*, 493 U.S. 165, 169-70 (1989); *Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1219 (11th Cir. 2001); *Haynes v. Singer Co., Inc*., 696 F.2d 884, 886-87 (11th Cir. 1983). Then, after discovery is completed and the case is ready for trial, the court revisits the issue of certification.  Therefore, certification, if granted at the preliminary stage, is always conditional.

In making the initial decision regarding certification, the court must consider whether it will serve the purposes and putative benefits of a collective action under § 216. The Supreme Court has identified the main benefits of a collective action under § 216(b):

A collective action allows . . . plaintiffs the advantage of lower

---

1240, 1243 n.2 (11th Cir. 2003).

The second determination is typically precipitated by a motion for "decertification" by the defendant usually filed after discovery is largely complete and the matter is ready for trial.  At this stage, the court has much more information on which to base its decision, and makes a factual determination on the similarly situated question.  If the claimants are similarly situated, the district court allows the representative action to proceed to trial.  If the claimants are not similarly situated, the district court decertifies the class, and the opt-in plaintiffs are dismissed without prejudice.  The class representatives-i.e. the original plaintiffs-proceed to trial on their individual claims.

*Id.*

individual costs to vindicate rights by the pooling of resources. The judicial system benefits by efficient resolution in one proceeding of common issues of law and fact arising from the same alleged . . . activity.

*Hoffmann-La Roche, Inc.,* 493 U.S. at 170.  Accordingly, the court must balance the putative benefits against any prejudice to Defendants and any judicial inefficiencies that may result from allowing the case to proceed collectively.  *See Bayles v. American Medical Response of Colorado, Inc.,* 950 F. Supp. 1053, 1067 (D. Colo. 1996).

Under the applicable collective action legal principles, this court must "satisfy itself that there are other employees of [Defendants] who desire to 'opt in' and who are 'similarly situated' [to Plaintiff] with respect to their job requirements and with regard to their pay provisions." *Dybach v. Florida Dept. of Corrections*, 942 F.2d 1562, 1567-68 (11th Cir. 1991).  Plaintiffs bear the burden of demonstrating a "reasonable basis for crediting their assertions that aggrieved individuals existed in the broad class that they proposed." *Haynes v. Singer Co., Inc.*, 696 F.2d 884, 887 (11th Cir. 1983).  *See also Grayson v. K-Mart Corp.*, 79 F.3d 1086, 1097 (11th Cir. 1996) (same).  "The plaintiffs may meet this burden, which is not heavy, by making substantial allegations of class-wide discrimination, that is, detailed allegations supported by affidavits which successfully engage defendants' affidavits to the

12

contrary." *Hipp*, 252 F.3d at 1219 (quoting *Grayson*, 79 F.3d at 1097).

    **2.**    **Application of the legal standard is frustrated by inconsistencies within Grantham's proposed notice, the motion, and the briefs such that the court cannot discern the scope of the proposed collective action without engaging in guesswork.**

Prior to reaching the "opt-in" and "similarly situated" issues, the court must address certain problems with the proposed notice and the instant motion that cause conditional certification to be inappropriate at this juncture. Given the varied and inconsistent positions taken by Grantham in his pleadings and briefs, the court cannot discern ,without engaging in speculation, what the definitions of Grantham's proposed class are.

Grantham's Complaint only asserts claims for relief based on Agrium's alleged failure to pay for pre-shift work; however, the present motion seeks a notice to be sent out regarding Agrium's alleged failure to pay for "pre-shift and/or post-shift" work.[7] (Proposed Notice, doc. 18-1, p. 1). Because the Complaint only pleads facts that indicate an entitlement to relief based on alleged pre-shift work, the court will not consider Grantham's argument, raised for the first time in the present motion, that he

_____

[7] Defendant did not raise the alarm that Grantham was seeking to send out notice for claims that are not made in the Complaint. Generally, the court will not address arguments that are not raised by a party. In this instance, however, the inclusion of additional claims that are not made in the Complaint is an issue of such importance in the effective management of this litigation that the court was compelled to raise it *sua sponte*.

is also entitled to damages resulting from uncompensated post-shift work.  Grantham cannot amend his claims by way of the motion at bar.

Furthermore, Grantham cannot seem to settle on a clearly defined group who should be entitled to notice.  As noted above, the motion requests that a conditional class be certified and notice delivered to "all current and former hourly wage employees" dating back to March 2007.  However, in his brief, Grantham requests that the potential notice group exclude "those in shipping and receiving." (Grantham's Brief, doc. 19, p. 5).  It is not clear from the pleadings or the record whether the proposed class of 70 current and former hourly employees at Agrium's Sylacauga, Alabama, facility includes employees in "shipping and receiving."  Also, in his reply brief, Grantham seeks to exclude lead operators[8] who have time keeping and payroll responsibilities.  The court was intrigued by this proposed modification in light of the fact that Grantham was a lead operator and would therefore presumably be excluded from his own proposed collective action.  In his Sur-Sur Reply, however, Grantham, generally argues that other lead operators would be excluded from any potential collective action, but that he would not because there is no evidence that he had those responsibilities and that "[j]ob titles mean nothing."  (Doc. 31, p. 5).

_____

[8] Grantham inexplicably uses the term "lead men" in his reply but later implies in his "Sur-Sur Reply" that "lead men" and "lead operators" are synonymous.  (Doc. 31, pp. 4-7).

Also in the Sur-Sur Reply, Grantham reverts to his original, unmodified statement regarding the scope of the proposed notice class: that it should be made up of all former and current hourly workers at the Sylacauga, Alabama, facility. (Plaintiff's Motion to Facilitate Court-Approved Notice under 29 U.S.C. § 216(b), doc. 18, pp. 1-2; Grantham's Sur-Sur Reply, doc. 31, pp. 5-6 (requesting that notice be sent to "all hourly paid, non-exempt employees at [Agrium's] facility in Alabama")).  Grantham argues that notice should be sent to those individuals who he has formerly posited are not proper members of this collective action, such as hourly workers in "shipping and receiving."  He contends that the court should allow those individuals to opt-in to this case and, at the decertification stage, should dismiss opt-in parties who are not similarly situated or that the court should later create a "sub-class" for the purpose of adjudicating those individuals' claims. (Grantham's Sur-Sur Reply; doc. 31, p. 6).  Grantham has not cited any legal authority in support of his argument that notice should be delivered to individuals who he has admitted are not similarly situated and that those individuals should be allowed to opt-in to a conditionally certified collective action when there is no reasonable basis for including them in the class.  Such a notion runs contrary to established Eleventh Circuit precedent that a plaintiff must demonstrate a "reasonable basis" for collective action status.  In that regard, Grantham's argument that notice should be sent to such

15

individuals cuts against the merits of the present motion.  Nevertheless, Grantham

posits that the court should look beyond those paradoxical inconsistencies and

should, instead, parse out the different collective actions or sub-classes at the

decertification stage.  Grantham has not cited any legal authority that such a course

is appropriate, and the court believes that providing court-facilitated notice as

Grantham suggests "will do nothing but stir up a hornets' nest of litigation and further

increase the complexities of case management."  *Ojeda-Sanchez v. Bland*, No.

608CV096, 2009 WL 3851623, at *3 (S.D. Ga. Nov. 17, 2009).

This court finds that it is implicitly part of a plaintiff's burden on a motion for

conditional certification to state, in an unequivocal and straightforward way, who the

likely members of his proposed class are.  Without such a clear statement, the court

cannot determine whether the "opt-in" or "similarly situated" requirements are met

if, for no other reason, because there is no way to determine how large the proposed

collective action is or who might comprise the group.  In the present case, the motion

fails because the definitions of the proposed class are not unambiguously stated in the

record by Grantham and the court will not engage (and cannot engage based on the

limited evidence) in what amounts to speculation in an effort to craft a suitable notice

class.  Courts are not obligated to read a party's mind or to construct arguments that

it has failed to raise and that are not reasonably presented in the court file. *See*

*Resolution Trust Corp. v. Dunmar Corp.,* 43 F.3d 587, 599 (11th Cir. 1995) ("There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it . . . ."). "[T]he onus is upon the parties to formulate arguments." *Resolution Trust,* 43 F.3d at 599; *Bowden ex rel. Bowden v. Wal-Mart Stores, Inc.,* 124 F.Supp.2d 1228, 1236 (M.D. Ala. 2000) ("It is not for the court to manufacture arguments on Plaintiff's behalf."). Accordingly, Grantham's decision to present this court with the parameters of the proposed notice group, to deviate from those parameters, and then to return to the original statement without any justification was done at Grantham's peril.

### 3.     Application of the Legal Framework[9]

### a.     The Opt-In Interest Requirement

Turning to the first requirement, Grantham has provided his own declaration and declarations from two former hourly employees, McDonald and Reeves, as evidence in support of his claim that there are other hourly employees who wish to opt-into this litigation. (Doc. 20). Given the size of the proposed collective action and the number of declarations presented in opposition to the present motion, the court finds that Grantham's proffered declarations are not adequate to show the

---

[9] The court offers the following analysis based upon Grantham's proposed collective action that would include all former and current hourly employees at Agrium's Sylacauga, Alabama, facility.

requisite desire to opt-in this particular case.  While it is true that McDonald and Reeves filed notices of consent to become party plaintiffs, Grantham has not identified any other former or current employees (in fact, he has not identified any current employee) who he contends would have an interest in opting-in a collective action should one be conditionally certified.  *See*, *e.g.*, *Saxton v. Title Max of Alabama, Inc.*, 431 F. Supp. 2d 1185, 1187 (N.D. Ala. 2006) (denying a motion to conditionally certify a collective action where plaintiffs provided only one affidavit from a potential opt-in plaintiff); *Wombles v. Title Max of Alabama, Inc.*, No. Civ.A. 3:03-CV-01158-CSC, 2005 WL 3312670 (M.D. Ala. Dec. 7, 2005) (denying a motion to conditionally certify a collective action in part because the plaintiff failed to show a sufficient interest of others to opt-in where the plaintiff's only evidence was two affidavits from would-be opt-in plaintiffs).  It is significant that, out of Grantham's proposed class of 70 people, he has only identified 2 former employees, or roughly 2.9% of his proposed class, who have expressed a desire to opt-in this case should it be certified as a collective action.

In comparison, Agrium has presented 16 declarations of current hourly employees.  Each of those individuals have indicated that they do not wish to join as plaintiffs in this case.  In other words, approximately 22.9% of the proposed class does not wish to opt-in.  That evidence, when compared to Grantham's declarations,

belies Grantham's argument that there are a significant number of people interested in opting-in to this lawsuit.  *See Saxton*, 431 F. Supp. 2d at 1187-88 (denying collective action where a defendant provided 158 affidavits "indicating that members of a potential opt-in class likely have no interest in opting in to this lawsuit"); *Wombles*, 2005 WL 3312670, at *3 (denying conditional certification and noting that two individuals expressed interest in joining a potential collective action while 46 employees filed affidavits stating that they did not wish to participate).  In other words, Grantham has not met his burden to "successfully engage" Agrium's contradictory evidence.  *Grayson*, 79 F.3d at 1099 n.17.  In light of the evidence of record and Grantham's failure to present the court with evidence that sufficiently contradicts the declarations provided by Agrium, the court finds that Grantham has not demonstrated, even under the lenient standard of *Hipp*, *supra*, a "reasonable basis for crediting [his] assertions that aggrieved individuals existed in the broad class that [he] proposed."[10]  *Haynes*, 696 F.2d at 887.

### b.    The Substantially Similar Requirement

The court reads *Dybach*, *supra*, to require a comparison of the pool of potential

---

[10] The court observes that, because Grantham has not provided any evidence of a current employee who wishes to opt-in this litigation, any notice group or potential collective action that might have resulted in this case, would have been limited to former employees only.  The 22 declarations from current hourly workers and supervisors provided by Agrium uniformly reject Grantham's allegation that current employees are subjected to such a policy.

opt-in candidates with Grantham to see if their job requirements and pay provisions are substantially similar. *See also Grayson*, 79 F.3d at 1096 ("[P]laintiffs need show only 'that their positions are similar, not identical,' to the positions held by the putative class members.") (citation omitted).   Moreover, "the burden is on the plaintiffs to make an evidentiary showing that they and the proposed class are similarly situated, not on the defendants to disprove such similarity." *Reed v. Mobile County Sch. Sys.*, 246 F. Supp. 2d 1227, 1232 (S.D. Ala. 2003). "[U]nsupported assertions of widespread violations are not sufficient to meet Plaintiff's burden." *Freeman v. Wal-Mart Stores, Inc.*, 256 F. Supp. 2d 941, 945 (W.D. Ark. 2003) (citing *Haynes v. Singer Co., Inc.*, 696 F.2d 884, 887 (11th Cir. 1983)). "[T]he 'similarly situated' requirement of § 216(b) is more elastic and less stringent than the requirements found in Rule 20 (joinder) and Rule 42 (severance)." *Grayson*, 79 F.3d at 1095 (emphasis added).  On the other hand, "[a] court may deny plaintiffs' right to proceed collectively if the action arises from circumstances purely personal to the plaintiff, and not from any generally applicable rule, policy, or practice." *Williams v. Accredited Home Lenders, Inc.*, No. 1:05-CV-1681-TWT,  2006 WL 2085312 , at *4 (N.D. Ga. July 25, 2006) (quoting *England v. New Century Financial Corp.*, 370 F. Supp. 2d 504, 507 (M.D. La. 2005)) (emphasis added).

Grantham's argument is seemingly that all hourly employees at Agrium's

Sylacauga, Alabama, facility are similarly situated <u>because</u> they are hourly employees who work at that facility.  The court will not adopt such a broad view of the "similarly situated" requirement.  Doing so would essentially cause the "similarly situated" requirement to lose all meaning, and would effectively endorse the position that a court should always find that employees are similarly situated when they are paid on an hourly basis by the same employer and at the same facility.  Even under the lenient test of *Hipp*, a plaintiff must show more to reach the "similarly situated" bar.  In this case, Grantham is seeking to send notice to hourly employees in five different production plants, warehouses, a maintenance shop, a laboratory, a "Product Innovation" area, a "bagging" area, administrative offices, and purchasing offices without any evidence of inter-facility similarities among the different job descriptions of hourly workers.  Based on the broad allegations and the sparse evidence of record, to find that all hourly employees are similarly situated is too great a leap for this court to make.

Moreover, based on the allegations and evidence before this court, Grantham is not similarly situated to either of the potential opt-in plaintiffs.  "To be similarly situated, courts have held positions need not be identical, but similar." *Tucker v. Labor Leasing, Inc.*, 872 F. Supp. 941, 947 (M.D. Fla. 1994) (citation omitted).  Here, the differences in job duties among Grantham, McDonald, and Reeves do not rise to

the level of being "similar" beyond the fact that they were hourly employees who worked at Agrium's Sylacauga, Alabama, facility.  According to their declarations, Grantham was a supervisor, while both McDonald and Reeves were in subordinate positions.  There is no evidence of any overlap in job duties among the three men. Grantham was also compensated at a noticeably higher hourly rate than McDonald and Reeves.  As such, the court finds that Grantham has failed in his burden to show that he is similarly situated to those potential members of a collective action.

Also, the undisputed evidence is that the job duties of a lead operator include the "filling out, reviewing, and approving the time cards for the assistant operators, loader operators, and utility persons . . . to ensure they are all paid correctly." (Agrium's Brief, doc. 22, p. 30; Grantham's Reply Brief, doc. 27, p. 13 ("Based on Defendant's evidence that lead men[11] are involved in the time and payroll system, Plaintiff withdraws his request to have notice sent to any current or former lead men who have specifically held the responsibility of insuring [sic] that employees are fully paid for all time worked.")).[12]  Upon consideration of that undisputed evidence,

---

[11] As discussed *supra*, the terms "lead men" and "lead operators" are synonymous.

[12] In his Sur-Sur Reply, Grantham unsuccessfully attempts to explain away the damning effect of this statement on the present motion.  Grantham's counsel states, without supporting evidence, that Grantham was not responsible for time keeping and payroll matters.  "Statements by counsel in briefs are not evidence."  *Skyline Corp. v. N.L.R.B.*, 613 F.2d 1328, 1337 (5th Cir. 1980).  On the other hand, the four lead operators who are currently employed by Agrium declared that time keeping and payroll duties were part of their job responsibilities (docs. 23-1,

Grantham, as a former lead operator, is not a suitable plaintiff to bring a collective action on behalf of those who were required to submit their time records and payroll information to lead operators for review or approval.  Stated differently, he is not similarly situated to "all" hourly employees, and he is likely in conflict with many of those individuals who might necessarily argue that Grantham was both a victim of and contributor to the alleged FLSA violations in this case.

Agrium relies greatly on *White v. Osmore, Inc.*, 204 F. Supp. 2d 1309 (M.D. Ala. 2002), a case that is factually similar to the action at bar.  The court is persuaded that the facts and holding of *White* provide helpful guidance in the instant action.

The named plaintiff, Chesley White, was employed "as an hourly paid foreman" for Osmore, Inc.  *White*, 204 F. Supp. 2d at 1311.  The district court summarized White's allegations as follows:

> As part of his duties, White was required to drive a company truck to job sites. Apparently with some regularity, job sites were distantly located from White's and crewmen's homes. Often this meant that White and his crewmen had to stay in motels during the work week. White alleges that he was not compensated for much of the travel incident to his job. White also alleges that he was often required to transport crewmen to and from their homes on the weekends, without

Ex. 1-4), and Grantham himself declared that his "job duties included . . . overseeing those working under [him]."  (Declaration of Matthew Grantham, doc. 20-1, para. 4).  There is no evidence before the court that Grantham, as a lead operator, was not responsible for timekeeping and payroll duties.  The evidence of record is that lead operators have timekeeping and payroll responsibilities, and the court will not disregard that evidence as to Grantham's job duties in the absence of evidence that his responsibilities differed from those of other lead operators.

23

compensation. Further, White alleges that he was told not to turn in time for cleaning and maintaining the company truck, which comprised an "integral and indispensable" portion of his duties.

In addition to his duties with respect to the company truck and the "in the field" work, White alleges that he was required to perform administrative duties largely "off the clock." These duties included submitting his crew's payroll information and planning and keeping track of the field work with a handheld computer and various maps. White says that these duties often required several hours each week, and often had to be completed at night, "after hours." White also alleges that he was required to attend numerous supervisory meetings for which he was not paid, and that he had to interview prospective crewmen, also without compensation.

White contends that being required to perform these various duties without being properly compensated constitutes a policy violative of the FLSA. Furthermore, White alleges that his experiences are common, and that potentially there is a large number of foremen and crewmen with substantially similar grievances.

*Id.*

White filed a motion seeking conditional certification of an FLSA collective action to include "current and former Osmose employees who are allegedly similarly situated with respect to job duties and pay provisions, and to authorize notice to these individuals of their "opt-in" rights." *Id.* at 1311-12. White contended that the class "should be composed of all foreman and crewmen employed by Osmose in its utilities division within the three years preceding the filing of [the] lawsuit." *Id.* at 1312. The district court first addressed whether White was similarly situated to the other

24

members of the potential class and held that he was not. *Id.* Specifically, the district court found that, because foremen were "responsible for reporting the hours worked by their crew, foremen are potentially complicit in the allegedly unlawful practice of failing to report overtime . . . . The court is persuaded that since foremen may be held responsible for the potential claims of crewmen, there is an inherent conflict of interest between the two groups." *White*, 204 F. Supp. 2d at 1314. When denying the motion for conditional collective action certification, the district court concluded that "[b]ecause the court finds that the job duties of foremen and crewmen are dissimilar, and that there is inherent conflict between the two groups, the court concludes that crewmen should be excluded from a conditionally certified class." *Id.* at 1315.

In the present case, similar to the named plaintiff in *White*, lead operators are responsible for ensuring that employees are fully paid for all time worked. Those employees included assistant operators, loader operators, and utility persons. The two potential opt-in plaintiffs are a former assistant operator and loader operator, respectively. Therefore, the court finds that there is an inherent conflict of interest between Grantham (a former lead operator) and the two would-be opt-in plaintiffs because Grantham is possibly a contributor to the alleged unlawful acts insofar as assistant operators, loader operators, and utility persons are concerned. Based on that potential conflict of interest, the court concludes that Grantham has not shown that

25

he is similarly situated to the would-be opt-in plaintiffs (McDonald and Reeves) or to "all" hourly employees.

In light of the foregoing, the court finds that Grantham's allegations and claims are too individualized to justify collective action certification in this case, despite the allegations and evidence that Agrium did not compensate Grantham, McDonald, and Reeves for pre-shift work.

## IV.   CONCLUSION AND ORDER

For the reasons discussed herein, "Plaintiff's Motion to Facilitate Court-Approved Notice Under 29 U.S.C. § 216(b)" (doc. 18) is **DENIED**.

The parties are **ORDERED**, within 14 days from the date of this Memorandum Opinion and Order, to confer and file a modified Report of Parties' Planning Meeting that is consistent with Federal Rule of Civil Procedure 26(f) and this court's Uniform Initial Order (doc. 9). The parties are reminded of the provision of the Uniform Initial Order that "requires that the attorneys for all parties make an early analysis of the case along with their clients and be prepared to discuss settlement at an early date. The parties shall also consider and discuss whether this action may be suitable for mediation, whether under the court's ADR plan or otherwise." (Doc. 9, p. 4). In keeping with the Uniform Initial Order, the parties must include the results of those

discussions in the modified report.[13]  (Doc. 9, p. 4).

      **DONE** and **ORDERED** this the 16th day of April, 2010.

 

                                               _____

                                               **VIRGINIA EMERSON HOPKINS**
                                               United States District Judge

---

[13] The court notes that the parties did not include this information in their original Report of Parties' Planning Meeting (doc. 11).